TATE, Judge
(dissenting).
I regretfully must differ from my conscientious brethren.
In my opinion, the decision of the District Court is supported by the overwhelming preponderance of the sworn evidence; and in arriving at a contrary result, we are substituting merely our own opinions for this sworn testimony. We are further committing error of law in allowing a routine and perhaps unconsidered accident report greater weight than the sworn testimony at the trial of the police officers who prepared this same report.
In an opinion ably summarizing the evidence, .the District Court found that *187 the defendants’ trucks going uphill had pulled out across the center of the highway to pass a car parked in their lane, and into the path of decedent’s log truck which had come over the crest of the hill. The Simmons’ truck attempted to back up, and the Blossman’s truck motor had stalled. The District Court concluded that the accident was caused by the defendant trucks’ negligence in attempting to pass the parked vehicle on the upgrade of a hill'and in the face of opposing traffic, LSA-R.S. 32:233, and that if decedent lost control of his truck immedately prior to the accident, it was due to the emergency created by the negligence of defendants’ trucks in being passing or stalled immediately in his path on his portion of this narrow gravelled road.
I believe these conclusions are supported by the following evidence:
1. The sworn testimony of Louisiana State Trooper Anderson and Chief Deputy Sheriff Walter Gill, investigating officers who arrived on the scene 45 minutes after the accident, that: (a) the point of impact, as instanced by broken glass, skid marks of both decedent’s and. the Blossman truck, and other physical accident was from eighteen to thirty-six inches over the center of the highway, and in the lane of traffic reserved for decedent’s oncoming vehicle and in decedent’s path; (b) that the tracks of the Lanier (decedent’s) truck were clearly discernable in the gravel road, and that at point of impact the outer such skidmarks were from eight to twelve inches from the steep three feet deep ditch, that these skidmarks began at the scene of the impact and were to the extreme right (ditch-side) of the Lanier truck’s lane of the road continuing on from there across the road to the point where the Lanier truck was crashed against the tree.
2. The sworn testimony of (á) Doyle Bridges (living at the scene of the accident, whom the noise of the collision ■ attracted immediately afterwards) corroborating that the glass of the collision was in decedent’s lane of traffic and that even after the impact the Simmons truck was at the center’of the road; of (b) Martin McKnight (a truckdriver who arrived at the scene of the accident shortly after-wards) to the same effect and to the effect that he had examined the skidmarks made by the Blossman truck from the point where it landed back to the point of impact and from them deduced that the Blossman truck was from one and one-half to two feet in decedent’s lane of traffic at the time of impact, and that the tracks made by the Lanier truck were on its extreme right-hand side of the road approximately one foot from the ditch at the time of impact; and of (c) Charles Graves, an automotive shop foreman called to the scene of the accident by the Blossman company, corroborating this testimony, that the Lanier truck track marks showed decedent had pulled across to his side of the • road as far as he could without falling into the ditch at the point of impact, that the Bloss-man truck tracks showed that it was sticking out a couple of feet into decedent’s lane at point of impact and was dragged around to where it landed in the ditch.
I do not believe it is within the province of this Court to substitute its opinion that tracks and physical evidence such as described by these five apparently disinterested witnesses could not have been made or discerned on the gravel road in question, for their sworn testimony that such tracks were there and discernible. This is to substitute mere speculation on our part for sworn testimony of witnesses— sworn testimony which is not seriously disputed by contrary evidence or even by searching cross-examination. To hold that such tracks could not possibly have been made by the desperate and perhaps terrorized application of brakes on this heavy logtruck, does not appear to me to be so infallible an assumption as for us on the the strength thereof to characterize as coldblooded perjury the testimony of Trooper Anderson, Deputy Sheriff Gill, and Messrs. Bridges, McKnight, arid Graves.
This sworn testimony is not conjectural and positively places by sworn testimony the point of impact as over in decedent’s portion of highway.
*188 The majority’s decision of decedent’s contributory negligence is also based upon decedent’s proceeding at too great a rate of speed under the circumstances and not having his truck under control. This latter is based upon decedent’s truck swaying on the road at the time of the accident according to the testimony of Lambert, driver of defendant Simmons’ truck. Lambert admits having pulled out to pass the parked truck after the first oncoming (the Jones) truck had passed, and was at the center of the road and judged the Bloss-man truck was a little further out past his own truck starting around him in the path of oncoming vehicles (although under cross-examination by his codefendant’s counsel, he stated that this was based not on direct observation but the greater impact received by the Blossman truck). Lambert judged that the two oncoming trucks were proceeding at a speed of forty to forty-five miles per hour. He did not see decedent’s oncoming truck until he had pulled out to decedent’s lane of traffic after the first truck had passed, and decedent’s truck did not start zigzagging until sixty feet from the point of impact! (Tr-89). It would appear to me that if decedent’s truck went out of control, it was because faced with the sudden emergency created when two trucks pulled out into his lane on this narrow road.
It is interesting that this hostile witness too, like the five disinterested witnesses so far listed, testified that the Blossman truck made positive tracks going counterclockwise from point of impact to the point where it ended up facing into the ditch. While the majority feels that this could not be so, and disregards the explanation of the investigating officers that the report incorrectly showed the Blossman truck as going clockwise due to clerical error; and while whether the Blossman truck went clockwise or counterclockwise is immaterial to our decision of this matter; I feel that the holding contrary to this sworn testimony because more probably the truck might have gone clockwise is unwarranted.
The majority result further disregards the testimony of John R. Jones, who was driving the truck immediately preceding decedent’s truck, which the drivers of defendants’ two trucks place as having passed immediately before the accident. Jones testified that due to a stopped radiator he had requested decedent to drive immediately behind him in case he had motor trouble and that they were going about twenty to twenty-five miles per hour. He testified ing that he remembered passing the truck parked protruding into the other lane of traffic, that he saw the defendant Simmons’ truck pull up and stop behind it just before he (Jones) passed the scene, and that the Blossman pick-up truck pulled in just as he (Jones) passed and then cut out, driving at a very fast rate of speed Jones estimated at sixty miles per hour. Jones testified positively that in his mirror he saw the Bloss-man truck pull out into the middle of the road, and that then a “dust cloud” came between him and the Blossman truck (Tr-36). As testified by Jones, “the dust gradually came between us” (Tr-36), or ■“the dust had settled between us” (Tr-41), or “A dust . cloud came between us” (Tr — 42) ; and therefore he did not see the actual impact and did not in fact know that an accident had happened until he returned to the mill, although when subsequently he noticed the Lanier truck was no longer following him, he assumed something must have happened. (Both defendants’ drivers admit the road was dusty.)
■ In the face of this sworn testimony of Jones and of these at least .five other disinterested witnesses, the majority accepts without cavil the testimony of A. R. Tweedy, Tangipahoa Parish Manager for A.' R. Blossman, Inc., and driver of the Blossman pick-up truck, that he had stopped on his own side of the road before the accident. While this witness was verbally more agile than the other witnesses and perhaps better educated, I do not feel that this imparts to his testimony greater accuracy or disinterestedness; and taking into consideration that this serious accident happened within split. seconds, while not necessarily, doubting Tweedy’s sincerity, it seems to me entirely conceivable that he did not actually know on what portion of thfi *189 road his motor stalled and when he had ducked out after the Jones truck had passed, only suddenly to realize that a second truck was closely following Jones on that dusty road.
That the heavily loaded Lanier log truck continued 90 feet on the gravelled downgrade after slight impact with the other trucks is not to me indicative of any great speed.
To reach its conclusion the majority opinion placed great reliance upon the routine accident report completed by the investigating officers after the accident. In my opinion, to substitute this routine accident report for their own sworn testimony was error of law.
No authority is quoted for the presumption that hasty sketches and comments on roughly drawn and written routine reports are to be accorded such great weight as to outweigh their sworn and far more comprehensive testimony. In fact, from an examination of the sketch of the accident, with the road approximately %s inch in width, and each vehicle roughly sketched as %e inch wide, my appreciation of this sketch is that the Blossman truck is %2 inch from its side of the road, the Lanier (decedent’s) truck %2 inch from its side of the road, and if the Blossman truck is not over the center line, this could be definitely measured only by calipers. It appears to me extremely doubtful that this rough sketch was meant to be a definitive recapitulation of the accident. Further, that the investigating officers in deference to Tweedy’s explanations stated on this report that the Blossman vehicle may have been “on or near” the center of the road, does not to me indicate any serious reason to question their own sworn testimony that, despite Tweedy’s opinion, from physical evidence they themselves placed the point of impact with Tweedy’s truck "on” the center of the road. To disregard the officers’ finding that the Blossman and Simmons truck “did not have right of way” under “violations indicated” (thus indicating, that they attempted to pass in disregard of their right of way), but to accept their on the spot opinion that decedent “was driving too fast for conditions” appears to disregard the fundamental principle that it is the function of the courts, not of the investigating officers, to decide whether the speed involved constituted negligence which was a proximate cause of the accident in question.
'Whether the' speed of the decedent’s truck was 20-25 miles per hour as testified by Jones who had preceded it for several miles, .or whether it was 40 miles per hour as was the opinion of the drivers of defendants’ trucks who glimpsed it for several split seconds before the accident — in my opinion, the proximate cause of the accident was not any speed of the Lanier truck, but the negligence of defendants’ trucks in (after the Jones truck had passed, unaware that Jones was closely followed by Lanier) cutting out suddenly onto the decedent’s lane of traffic and immediately in his path, causing him to lose control of his truck approximately sixty feet from the point of impact.
For the above reasons, while I sincerely regret differing from my esteemed arid conscientious brethren and their well-considered conclusions, I must respectfully dissent.
Rehearing denied.
TATE, J., dissenting.